**VIRGIN ISLANDS TAXI ASSOCIATION, Plaintiff**
**v.**
**THE WEST INDIAN COMPANY, LIMITED; BLUE EXECUTIVE**
**SERVICES AND TRANSPORTATION, LLC d/b/a/ BEST TAXI; KERRY**
**HARRIGAN; AND TERRI GRIFFITHS, Defendants**

Case No. ST-16-CV-551

Superior Court of the Virgin Islands

Division of St. Thomas and St. John

October 31, 2016

155

156

LEE ROHN, ESQ., Lee J. Rohn and Associates, LLC, Christiansted, St. Croix, USVI, *For the Plaintiff*.

ADRIANE J. DUDLEY, ESQ., CAROL A. RICH, ESQ., Dudley Rich Davis, LLP, St. Thomas, USVI, *For the West Indian Company, Limited, Defendant*.

A. JEFFREY WEISS, ESQ., A. J. Weiss and Associates, St. Thomas, USVI, *For Blue Executive Services and Transportation, LLC d/b/a Best Taxi, Defendant*.

TERRI GRIFFITHS, ESQ., St. Thomas, USVI, *For Terri Griffiths and Kerry Harrigan, Defendants*.

WILLOCKS, *Administrative Judge*

## MEMORANDUM OPINION

(October 31, 2016)

**THIS MATTER** comes before the Court on Plaintiff Virgin Islands Taxi Association's (hereinafter "VITA") request for a preliminary injunction against Defendant West Indian Company, Limited (hereinafter "WICO") pursuant to its emergency Motion for Temporary Restraining Order and Preliminary Injunction against WICO, filed on September 23, 2016. Based on the serious allegations in the Complaint, the Court in a sense of *abundans cautela non nocet* granted the Temporary Restraining Order on September 28, 2016. On October 3, 2016, WICO filed an opposition to VITA's request for a preliminary injunction.

## BACKGROUND

VITA is a corporation that represents Virgin Islands taxi drivers for a commissioned fee. (Compl. ¶ 3.) WICO has the "status and authority of a public corporation and governmental instrumentality of the Government of the Virgin Islands" and is "deemed to be a public entity operating on behalf of the Government of the Virgin Islands, rather than a private corporation." (Act No. 5826 of the Virgin Islands Legislature.) VITA has held the franchise to provide taxicab services at the WICO cruise ship dock for over 40 years. (VITA's Closing Brief, ¶ 1.) These agreements between VITA and WICO have been a series of contracts that were renewed. (Id.) When the last concession agreement contract expired, VITA continued to provide taxicab services at the WICO cruise ship dock; and WICO continued to provide exclusive taxi concession to VITA, on a month-to-month basis. (Id., at ¶ 2.)

On June 1, 2016, WICO issued a request for qualifications 2016-0001 concession agreement for taxi service (hereinafter "RFQ"). (Id., at ¶ 6; Compl. ¶ 6.) The RFQ stated that WICO was requesting Statement of Qualifications (hereinafter "SOQ") from interested and qualified taxicab organizations to operate a concession at its cruise ship dock for a period of five (5) years. (Compl., Ex. 1.) According to the RFQ, "[t]he successful provider will be selected based on its ability to make available not less than 300 licensed vehicles and to submit evidence meeting the criteria set forth here to operate under a Concession Agreement with WICO." (Id.) Moreover, the RFQ indicated that the SOQ should conform to the following format:

> (1) Experience: provide a description of prior experience and qualifications in providing concession taxicab services; (2) Key Staff: identify the proposed Contract Manager and key team members and their responsibilities and provide a brief resume for each person outlining their credentials and experience; (3) Reference: provide the name and contact information for at least three references familiar with the quality of services under circumstances similar to the above Anticipated Scope of Work; and (4) Project Understanding: provide general understanding of taxicab services at the WICO cruise ship dock and issues regarding operating a concessions, and identify any potential challenges or special concerns that one may encounter. (Id.)

158

WICO indicated that it will use the following criteria to screen, rank, and select the successful provider:

(1) Qualifications of the Provider (30%): preference shall be given to those organizations with experience related to the anticipated scope of services; (2) Qualifications of the Project Team (Key Staff) (20%): preference shall be given to those with key staff familiar with the taxicab services at the WICO cruise ship dock; (3) Experience in Operating a Taxicab Concession (10%): preference shall be given to organizations whose personnel have a demonstrated working relationship with a taxicab concession and possess a thorough understanding of the rules and regulations governing the taxicab services; and (4) Project Understanding (40%): preference shall be given to those organizations, which have a thorough understanding of the requirements for the taxicab concession and the environment at the WICO cruise ship dock. (Id.)

WICO specifically reserved the right to reject any and all submissions to this RFQ, request for clarification or waive informalities/technicalities, if deemed to be in WICO's best interest. (Id.)

After being selected, the successful provider will, *inter alia*:

(1) execute a concession agreement with WICO; (2) provide complete, adequate, and efficient taxi services at the WICO cruise ship dock in accordance with said agreement, WICO's written rules of conduct and regulations for taxicabs, and the rules and regulations of the Virgin Islands Taxicab Commission; (3) ensure that each of its members is in good standing with the Virgin Islands Taxicab Commission and that they operate their taxicabs as cars for hire when providing services as part of the agreement; (4) submit copies of the "Certificate of Good Standing," U.S. Virgin Islands driving [sic] licenses, and proof of automobile liability insurance for each member; (5) immediately notify WICO of the suspension/termination of a member's services or the loss of a member's driving [sic] license; (6) procure an insurance policy(ies) from a company of proven financial stability and approved by WICO with limits of no less than $2,000,000.00 to cover the claims of bodily injury for any single claimant, no less than $2,000,000.00 to

159

cover multiple claims which may arise from a single accident, and $100,000.00 for property damage resulting from any one occurrence; (7) provide Certificates of Insurance to WICO on or before the effective date of the agreement; (8) assume and agree to pay and to indemnify and save WICO harmless from any and all liability for taxes, license fees, assessments and the like on [sic], resulting from or in connection with its operations at the WICO cruise ship dock; and (9) pay a monthly concession fee of $5,000.00. (Id.)

In response to WICO's RFQ, both VITA and Blue Executive Services and Transportation, LLC d/b/a Best Taxi (hereinafter "Best Taxi") submitted bids. On September 8, 2016, Best Taxi and VITA made presentations before the WICO Board. Joseph Boschulte (hereinafter "Boschulte"), Chief Executive Officer of WICO, Randolph Knight (hereinafter "Knight"), Chairman of the WICO Board, attended the September 8, 2016 Board meeting. Kerry Harrigan (hereinafter "Harrigan"), Manager of Best Taxi and co-owner of H&H Transportation (hereinafter "H&H") presented on behalf of Best Taxi, and Winston Parker (hereinafter "Parker"), in his capacity as President of VITA presented on behalf of VITA.[1] After the presentations were completed, the evaluation committee submitted its report along with three score sheets to the Board. One committee member voted in favor of VITA and the other two committee members' scores resulted in a draw. Ultimately, the Board voted four to one in favor of awarding the bid to Best Taxi.

On September 12, 2016, VITA was notified that Best Taxi was awarded the bid and that the concession agreement was slated to take effect on October 1, 2016. VITA filed a Complaint against WICO, Best Taxi, Kerry Harrigan,[2] and Terri Griffiths on September 21, 2016. VITA alleged, *inter alia*, that VITA was the only applicant qualified to win the bid for the concession agreement, and that "but for undue influence and corruption and improper use of confidential information by Terri Griffiths and Kerry

---

[1] WICO Board members Joyce Dore-Griffin, Michael Watson, and Edward Thomas also attended the September 8, 2016 meeting, but they did not testify at the hearing on the preliminary injunction.

[2] Per VITA's motion, the Court dismissed Kerry Harrigan without prejudice.

Harrigan,[3] [Best Taxi] would not have been selected as the bid recipient. (Compl. ¶ 21.)

The only issue that could possibly be related to the corruption allegation was that Terri Griffiths, Esq. once represented VITA, and is now representing the competitor of VITA, Best Taxi. However, during the course of the hearing, the only evidence brought forth by VITA was the aforementioned statement. Except for this bald statement, no other evidence or testimony was offered to substantiate the issue of corruption. Such allegations appear to be no more than to *ad captandum vulgus*.

■ VITA filed an emergency Motion for Temporary Restraining Order and Preliminary Injunction against WICO (hereinafter "Emergency Motion") on September 23, 2016. In its Emergency Motion, VITA requested the Court to enjoin WICO from awarding Best Taxi the concession agreement for taxicab services at the WICO cruise ship dock. On September 28, 2016, the Court issued a Memorandum opinion holding that "[Plaintiff] has met its burden and made a clear showing on all four factors"[4] and thus "entitled to the extraordinary remedy of the issuance of a [temporary restraining order]." *Virgin Islands Taxi Ass'n v. The W. Indian Co.*, ST-16-CV-551, 2016 V.I. LEXIS 150, at *16 (Super. Ct. Sep. 28, 2016) (unpublished).

In the accompanying order, the Court, *inter alia*, granted Plaintiff's Emergency Motion as to VITA's request for a temporary restraining order, enjoined WICO from allowing Best Taxi to commence service at the WICO cruise ship dock on October 1, 2016, and scheduled a hearing

---

[3] Terri Griffiths is the former legal counsel for Plaintiff VITA. (Compl. ¶ 5.) Kerry Harrigan is a former member of Plaintiff VITA's litigation committee. (Compl. ¶ 4.) VITA claimed that they obtained confidential information during their tenures with VITA and improperly converted VITA's file into their own. (Compl. ¶¶ 8, 10.)

[4] Precedents from the Supreme Court of the Virgin Islands establish that the Superior Court shall consider four factors in deciding a motion for preliminary injunction: (1) whether the movant has shown a reasonable probability of success on the merits; (2) whether the movant will be irreparably injured by denial of the relief; (3) whether granting preliminary relief will result in even greater harm to the nonmoving party; and (4) whether granting the preliminary relief will be in the public interest. *3RC & Co. v. Boynes Trucking Sys.*, 63 V.I. 544, 550 (V.I. 2015); *Petrus v. Queen Charlotte Hotel Corp.*, 56 V.I. 548, 554 (V.I. 2012). The factors to be considered when evaluating a temporary restraining order request are the same factors courts consider when evaluating whether to issue a preliminary injunction. *Appleyard v. Juan F. Luis Hosp. & Med. Ctr.*, SX-14-CV-282, 2014 V.I. LEXIS 56, at *4 (Super. Ct. July 28, 2014) (unpublished); *Pate v. Govt. of the V.I.*, ST-14-CV-479, 2014 V.I. LEXIS 112, at *7 (Super. Ct. Dec. 11, 2014) (unpublished).

on the issuance of a preliminary injunction. (Sept. 28, 2016 Order.) VITA posted bond in the amount of $18,000.00.[5]

■ On October 3, 2016, WICO filed an opposition to VITA's Motion for a Preliminary Injunction. Subsequently, the Court held the preliminary injunction hearing over the course of three days — October 4, 2016, October 11, 2016, and October 19, 2016. At the hearing, the Court heard testimony from various witnesses, including representatives of VITA, WICO, and Best Taxi. Given the lengthy nature of the preliminary injunction hearing, the Court extended the original temporary restraining order for an additional 14 days, from October 12, 2016 to October 26, 2016. At the conclusion of the preliminary injunction hearing, the Court allowed VITA and WICO to submit final briefs in writing[6]; and the Court took the matter under advisement. On October 21, 2016, VITA filed a document titled, "Plaintiff's Proposed Findings of Facts" (hereinafter "VITA's Closing Brief").[7] On October 24, 2016, WICO filed a document titled, "WICO's Closing Brief in Opposition to VITA's Motion for Injunctive Relief" (hereinafter "WICO's Closing Brief"). Best Taxi filed a document titled, "Reply to Plaintiffs Consolidated Opposition to Defendants' Motion to Dissolve Temporary Restraining Order and to Deny Preliminary Injunctive Relief"[8] (hereinafter "Best Taxi's Closing Brief") on October 24, 2016.

---

[5] The Court concluded in its September 30, 2016 memorandum opinion that, if the injunction was erroneously issued, WICO would sustain a loss of $3,000.00 per month in concession fees, in the total amount of $18,000.00 for six months. *Virgin Islands Taxi Ass'n v. The W. Indian Co.*, ST-16-CV-551, 2016 V.I. LEXIS 153, at *9 (Super. Ct. Sep. 30, 2016) (unpublished). The Court noted that, at this time, six months is a reasonable time frame to resolve this matter, and thus, the Court used this time frame to calculate the bond amount. *Id.*, 2016 V.I. LEXIS 153, at *9 fn.8.

[6] The Court ordered VITA to file its brief by October 21, 2016. WICO and Best Taxi were ordered to file their briefs by October 24, 2016.

[7] The Court will treat VITA's proposed finding of facts as its closing brief with regard to its motion for a preliminary injunction. *See Island Tile & Marble, LLC v. Bertrand*, 57 V.I. 596, 612 (2012) (noting that the substance of a motion and not its caption controls).

[8] WICO and Best Taxi each filed a motion to dissolve the temporary restraining order, on October 17, 2016 and October 18, 2016 respectively. Given that the temporary restraining order expired on October 26, 2016, the Court will deny these motions as moot in a separate order. Nevertheless, the Court will accept Best Taxi's "Reply to Plaintiff's Consolidated Opposition to Defendants' Motion to Dissolve Temporary Restraining Order and to Deny Preliminary Injunctive Relief," filed by the October 24, 2016 deadline, as Best Taxi's closing brief.

On October 26, 2016, the Court entered an order denying VITA's request for a preliminary injunction against WICO pursuant to its emergency Motion for Temporary Restraining Order and Preliminary Injunction against WICO, filed on September 23, 2016. This Memorandum Opinion will serve to explain the reasons for the Court's decision.

## STANDARD OF REVIEW

■ Federal Rule of Civil Procedure 65 (hereinafter "Rule 65") governs preliminary injunctions.[9] A preliminary injunction is an "extraordinary and drastic remedy," never awarded as of right. *Yusuf*, 59 V.I. at 847 (internal quotation omitted). Precedents from the Supreme Court of the Virgin Islands (hereinafter "Supreme Court") establish that the Superior Court shall consider four factors in deciding a Motion for Temporary Restraining Order and Preliminary Injunction:[10] (1) whether the movant has shown a reasonable probability of success on the merits; (2) whether the movant will be irreparably injured by denial of the relief; (3) whether granting preliminary relief will result in even greater harm to the nonmoving party; and (4) whether granting the preliminary relief will be in the public interest. *3RC & Co. Boynes Trucking Sys.*, 63 V.I. 544, 551 (V.I. 2015); *Petrus*, 56 V.I. at 554.

■ The moving party must "demonstrate that the injunction is necessary to avoid certain and imminent harm for which a monetary award does not adequately compensate." *3RC & Co.*, 63 V.I. at 554 (internal quotation omitted). However, irreparable injury alone is not enough to support equitable relief. *Id.* at 554. The moving party must also make at least some showing that it has a reasonable probability of success on the merits. *Id.* at 554-555. In other words, when faced with the task of

---

[9] Federal Rule of Civil Procedure 65 applies in the Superior Court pursuant to Superior Court Rule 7. *Yusuf v. Hamed*, 59 V.I. 841, n.2 (V.I. 2013). The Supreme Court of the Virgin Islands (hereinafter, "Supreme Court") has consistently recognized the availability of injunctive relief in the Virgin Islands. *See, e.g., Yusuf*, 59 V.I. 841; *3RC & Co.*, 63 V.I. 544; *Petrus v. Queen Charlotte Hotel Corp.*, 56 V.I. 548 (V.I. 2012); *Crucians in Focus, Inc. v. VI4D, LLLP*, 57 V.I. 529 (V.I. 2012). Since there are precedents from the Supreme Court regarding motions for preliminary injunction, the Court will use the standard of review set forth in said precedents.

[10] The factors to be considered when evaluating a temporary restraining order request are the same factors courts consider when evaluating whether to issue a preliminary injunction. *Appleyard*, 2014 V.I. LEXIS 56, at *4; *Pate*, 2014 V.I. LEXIS 112, at *7.

determining a request for injunctive relief, the Court must engage in an evaluation in combination of the moving party's claim of injury and its chance of success on the merits. *Id.* at 555. Moreover, the Court must also engage in an evaluation of the likelihood that the injunction would cause irreparable harm to the nonmoving party. *See id.* (explaining that an injunctive relief may still be appropriate where the moving party makes out a very strong showing on the merits and a weaker showing of likelihood of irreparable harm, so long as the nonmoving party's likelihood of irreparable harm is similarly low). Finally, the public interest factor will typically favor the moving party if he/she demonstrates both a likelihood of success on the merits and irreparable harm. *Id.* at 557.

■ The moving party has the burden of making some showing on all four factors. *Id.* at 557. In evaluating the injunctive motion, the Supreme Court instructed that the Superior Court "must evaluate the moving party's showing on all four factors under a sliding-scale standard." *Id.* The Supreme Court further instructed that, "[i]n conducting this sliding-scale analysis, the Superior Court must make findings on each of the four factors and determine whether — when the factors are considered together and weighed against one another — the moving party has made a clear showing that [it] is entitled to [injunctive] relief." *Id.* (internal quotation omitted).

## FINDINGS OF RELEVANT FACTS

1. VITA is a corporation that represents Virgin Islands taxi drivers for a commissioned fee. Testimony of Winston Parker.
2. WICO has the "status and authority of a public corporation and governmental instrumentality of the Government of the Virgin Islands" and is "deemed to be a public entity operating on behalf of the Government of the Virgin Islands, rather than a private corporation." Act No. 5826 of the Virgin Islands Legislature.
3. Best Taxi is a private corporation organized under the laws of the Virgin Islands. Pl.'s Ex. 25 and 27.
4. H&H Taxi is a private corporation organized under the laws of the Virgin Islands. Pl.'s Ex. 26.
5. Best Taxi is managed by Kerry Harrigan. Pl.'s Ex. 16.
6. Harrigan is also the president and co-owner of H&H. Def. Ex. 4, 4A, 92:2-9.

164

7. Harrigan was a member of VITA, but is no longer a member of VITA because he started his own taxi concession — H&H at Coki Point Beach and Coral World. Def. Ex. 4, 4A, 90:2-9; 91:18-25; 92:1-5.

8. One cannot be a member of VITA and another taxi concession. Parker Testimony.

9. Best Taxi and H&H will merge once the concession agreement is in place, but they are currently separate companies. Def. Ex. 4, 4A, 90:2-9.

10. This matter arises out of WICO's issuance of RFQ 2016-0001 for the taxi concession at WICO dock to Best Taxi. Def. Ex. 3, RFQ 2016-0001.

11. Since 1995, VITA entered into a series of contracts for its taxicab concession with WICO. Parker Testimony.

12. VITA was operating the taxi concession at the WICO dock on a month-to-month basis. Boschulte Testimony.

13. On June 1, 2016, VITA issued RFQ 2016-0001 concession agreement for taxi service. Def. Ex. 3, RFQ 2016-0001.

14. There is no requirement for WICO to follow a specific procurement process. WICO can procure business as needed based on its business judgment. Boschulte and Knight Testimony.

15. In April, WICO's Board voted to draft an RFQ. Boschulte stated that the team did research and due diligence as to what should be included in the RFQ. The team met with counsel, included language from other concession in the territory, came up with rules, regulations and requirements that each applicant should meet, and decided on a point system for transparency. Boschulte Testimony.

16. WICO decided to issue an RFQ because VITA had been operating on a month-to-month basis for a few years and WICO needed stability. Boschulte Testimony.

17. WICO has agreements with several cruise ship lines, and WICO had an obligation to ensure that certain services were available. Id.

18. About 15,000 cruise ship passengers could arrive in a single day. Def. Ex. 4A, 31:22-25.

165

19. WICO does not receive money from taxpayers. Boschulte Testimony.

20. WICO collects revenues primarily from, *inter alia*, passenger fees, taxi concession fees, real estate rentals (i.e. Yacht Haven Grand), managing Havensight Shopping Mall. Id.

21. In the RFQ, WICO required a SOQ from "interested and qualified taxicab organizations to operate a concession at its cruise ship dock adjacent to Havensight Shopping Mall located on St. Thomas, U.S.V.I. for the next five years." Def. Ex. 3, RFQ 2016-0001.

22. The RFQ indicated that "[t]he SOQ should conform to the following format:

(1) Experience: provide a description of prior experience and qualifications in providing concession taxicab services.

(2) Key Staff: identify the proposed Contract Manager and key team members and their responsibilities and provide a brief resume for each person outlining their credentials and experience.

(3) Reference: provide the name and contact information for at least three references familiar with the quality of services under circumstances similar to the above Anticipated Scope of Work.

(4) Project Understanding: provide general understanding of taxicab services at the WICO cruise ship dock and issues regarding operating a concessions, and identify any potential challenges or special concerns that one may encounter. Id.

23. WICO appointed "a committee to review the SOQs and rank the qualified organizations," and would "notify the unsuccessful organizations in writing no later than 10 days after selection of the successful service provider." Def. Ex. 3, RFQ 2016-0001. Boschulte Testimony.

24. "WICO's management team, which consisted of three members, reviewed proposals from three groups." The three groups were narrowed down to two organizations — Best Taxi and VITA. Def. Ex. 4, 4A, 48:6-10.

25. The role of WICO's evaluation committee was to evaluate submissions and disqualify applicants, determine which submissions were submitted in good faith, confirm that the orga-

166

nizations submitted the required four sealed copies, confirm that the responses satisfied the criteria, and interview providers that made it to the final stages. Id.

26. Five WICO Board members voted on the presentations:

(1) Joyce Dore-Griffin, Assistant Commissioner of Tourism, Vice Chairwoman of the WICO Board, member of the Taxi Commission.

(2) Michael Watson, co-owner of Petite Pump Room Restaurant, Chairman of the Finance Committee of the WICO Board.

(3) Randolph Knight, Chairman of the WICO Board and Chief of Staff to Governor Kenneth Mapp.[11]

(4) Edward Thomas, former President and CEO of WICO and WICO Board member. Boschulte Testimony.

(5) Joseph Boschulte, WICO Board member, President/CEO of WICO. Def. Ex. 4A, 4-5.

27. Ricaldo Lettsome, VITA shareholder and taxicab driver at WICO dock recused. Boschulte Testimony.

28. Each provider made a presentation and were questioned by Board members. Id.

29. After the presentations, the evaluation committee submitted a report to the Board along with a summary and three completed score sheets to the WICO Board. Id.

30. The Board was not required to select the applicant that the evaluation committee gave the highest score to. The Board could waive formalities and use its own business judgment. Knight and Boschulte Testimony.

31. After being selected, the successful provider was required to:

(1) execute a concession agreement with WICO;

(2) provide complete, adequate, and efficient taxi services at the WICO cruise ship dock in accordance with said agreement, WICO's written rules of conduct and regulations for taxicabs, and the rules and regulations of the Virgin Islands Taxicab Commission;

---

[11] On or about October 24, 2016, Knight resigned from his position as Chief of Staff and is no longer the Chairman of the WICO Board.

(3) ensure that each of its members is in good standing with the Virgin Islands Taxicab Commission and that they operate their taxicabs as cars for hire when providing services as part of the agreement;

(4) submit copies of the "Certificate of Good Standing," U.S. Virgin Islands driving [sic] license, and proof of automobile liability insurance for each member;

(5) immediately notify WICO of the suspension/termination of a member's services or the loss of a member's driving [sic] license;

(5) procure an insurance policy(ies) from a company of proven financial stability and approved by WICO with limits of no less than $2,000,000.00 to cover the claims of bodily injury for any single claimant, no less than $2,000,000.00 to cover multiple claims which may arise from a single accident, and $100,000.00 for property damage resulting from any one occurrence.

(6) name WICO as an additional insured on the policy(ies).

(7) obtain all insurance policies from a company of proven financial stability and approved by WICO.

(8) provide Certificates of Insurance to Defendant WICO on or before the effective date of the agreement;

(9) assume and agree to pay, and to indemnify and save WICO harmless from any and all liability for taxes, license fees, assessments, and the like on [sic], resulting from or in connection with its operations at the WICO cruise ship dock; and

(10) pay WICO $5,000.00 per month for a total amount of $60,000.00 per year during the duration of the concession agreement

(11) not deny service for any reason to any passenger requesting taxicab services, regardless of the number of passengers or their destination.

(12) not discriminate against any person based on race, age, national origin, sex, religion, disability, or any other basis established by federal or territorial law in any manner whatsoever. Id.

(13) ensure that between the hours of 6:30 a.m. and 10:00 p.m. that not less than 300 licensed taxicabs, exclusive use vehicles, including sedans, station wagons and standard 15-passenger vans, are available to meet an on-demand service standard, regardless of the

168

number of passengers requiring the same service at the Staging Area, unless unusual weather temporarily delays achieving the standard. Def. Ex. 3, RFQ 2016-0001.

32. In addition, the successful provider must, *inter alia*:

(1) keep accurate and detailed written records of all complaints, complements, and responses.

(2) provide a written customer service plan for WICO's review.

(3) promptly respond verbally and in writing to all complaints according to the Customer Service Plan, take immediate appropriate action and include all action taken in the complaint response form.

(4) demonstrate that it employs and trains professional, well-trained taxicab drivers, dispatchers, and other staff, as needed, to fulfill its obligations.

(5) submit a written copy of its training program to WICO within 90 days prior to the effective date of the concession agreement and on the anniversary of each subsequent year.

(6) conduct mandatory ongoing training for its personnel in accordance with the Training Plan that has been approved by WICO. Id.

33. According to the RFQ, WICO reserved "the right to reject any and all submissions to this RFQ, request for clarification or waive informalities/technicalities, if deemed to be in WICO's best interest." Id., Boschulte Testimony.

34. On August 1, 2016, the committee met to open the responses and to assess the respondents to the RFQ to determine whether they satisfied the requirements. Boschulte Testimony. Def. Ex. 4, 4A, 48:6-9.

35. The following criteria was used to screen, rank, and select the successful provider:

(1) Qualifications of the Provider (30%): preference shall be given to those organizations with experience related to the anticipated scope of services.

(2) Qualifications of the Project Team (Key Staff) (20%): preference shall be given to those with key staff familiar with the taxicab services at the WICO cruise ship dock.

(3) Experience in Operating a Taxicab Concession (10%): preference shall be given to organizations whose personnel have a demonstrated working relationship with a taxicab concession and possess a thorough understanding of the rules and regulations governing the taxicab services.

(4) Project Understanding (40%): preference shall be given to those organizations, which have a thorough understanding of the requirements for the taxicab concession and the environment at the WICO cruise ship dock. Def. Ex. 3, RFQ 2016-0001.

36. Unified Taxi, VITA, and Best Taxi submitted bids and were considered responsive by the evaluation committee. Pl. Ex. 17.

37. Unified Taxi was disqualified because "the submittal was not signed nor were any supporting documents submitted." Id.

38. Only Best Taxi and VITA were invited to make presentations to the WICO Board regarding their submissions. Id.

39. On September 8, 2016, Best Taxi and VITA made presentations to the WICO Board. Parker, Boschulte, Knight Testimony, Def Ex. 4, 4A.

40. Parker presented on VITA's behalf and Harrigan presented on behalf of Best Taxi. Id.

41. During the September 8, 2016 presentation, Parker on behalf of VITA stated that:

(1) VITA has close to 700 members. Def. Ex. 4, 4A, 8:16-19.

(2) VITA charges each member up to $60.00 per month for membership dues. Def. Ex. 4, 4A, 8:16-19.

(3) VITA also has smaller, less-lucrative taxi concessions at Frenchman's Reef Hotel, Sugar Bay, Sapphire Beach Hotel, and at the Cyril King Airport. Id., 9:12-15.

(4) VITA has a disciplinary committee that disciplines drivers who violate the rules. Id., 27:16-23.

(5) Before the RFQ was issued, VITA and WICO met to discuss issues related to violations at the WICO dock. Parker stated that VITA will not tolerate any more violations of rules and regulations; and those that break the rules would be terminated. Id., 34:3-12.

170

(6) VITA has an education plan and that they would start with tourism. Id., 34:13-18.

(7) VITA indicated that it would try to implement accepting credit cards, but some of the older drivers would have issues with the machines. Id., 35:17-20.

(8) VITA currently pays $18,500.00 per year in concession fees. Id., 44:7-15.

(9) VITA indicated that it would be willing to pay $35,000.00 and would go to $40,000.00 in yearly concession fees. Id., 44:16-19; 45:1-5; 46:2-3.

(11) VITA drivers and their family depend on the taxi concession at the WICO dock. Id., 41:19-20; 42:1-10.

42. VITA would suffer money damages if they were not awarded the taxicab concession. Affidavit of Winston Parker.

43. At the September 8, 2016 meeting, Harrigan on behalf of Best Taxi, stated that:

(1) Best Taxi had about 210 drivers, H&H has 25 drivers; and after the merger with H&H, Best Taxi could confirm 235 drivers, but could get more "once Best gets the concession." Def. Ex. 4, 4A, 62:10-11; 89:24-25; 90:6-14; 91:1-2.

(2) Harrigan was approached by over 100 drivers committed to joining the concession and inquiring about the concession. September 8, 2016 Board meeting, 62:3-5, 12-15.

(3) Best Taxi has vehicles to accommodate disabled and special needs passengers. Id., 105:16-25.

(4) In addition, Best Taxi has experience because it operated the Coki Point taxi concession.

(5) Best Taxi indicated that it would take steps to improve the passenger experience by requiring drivers to take a training course, giving surveys to the tourists about their experiences, and have mechanics inspect the vehicles semi-annually. Id., 63: 20-21; 76: 22-25; 77: 1-5.

(6) Best Taxi is currently exploring options to facilitate more efficient dispatching and transportation including rotating drivers. Id., 98: 18-21.

(7) All of Best Taxi's drivers would be prepared to accept credit cards. Id., 70: 9-15; 105:5-25; 106: 1-2.

171

(8) Best Taxi currently has One Million Dollars insurance coverage. Def. Ex. 7.

(9) Best Taxi agreed to purchase $2,000,000.00 insurance coverage after they are awarded the taxi concession. Id., 107:1-11. Harrigan Testimony.

(10) Best Taxi would not tolerate any acts of favoritism or violations of the rules and regulations by line jumping. Every driver would be assigned a number, and the numbers will be followed as a job becomes available. Id., 86: 21-24. Harrigan Testimony.

44. After the meeting was adjourned, the Board discussed the presentations. Def. Ex. 4A, 164-188.

45. The evaluation committee submitted an evaluation report, along with three score sheets. Pl. Ex. 17-18.

46. One committee member voted in favor of VITA and two were a draw. Id.

47. The Board voted four to one in favor of Best Taxi. Def. Ex. 4A, 188: 9-12.

48. Best Taxi was awarded the taxi concession effective October 1, 2016. Pl. Ex. 20.

49. WICO's operations are expected to be in the top five worldwide and WICO is expected to keep up with technology by millennials, because they do not carry cash. Boschulte and Knight Testimony.

50. Eighty-six percent of WICO's business relates to the cruise ship industry. Boschulte Testimony.

51. According to WICO, Best Taxi was best prepared to meet WICO's future business needs to service the cruise ship passengers, including millennials, because all of Best Taxi's drivers would be prepared to accept credit cards. Knight Testimony.

52. According to WICO, Best Taxi could quickly adapt to WICO's needs — most importantly, implementing credit card machines in all vehicles and paying the $60,000.00 concession fee. Id.

53. WICO was also concerned about incidents where members of VITA failed to follow the rules and regulations. Roy Moorehead, Boschulte, Knight Testimony.

54. WICO determined that Best Taxi satisfied all of the requirements in the RFQ. Knight and Boschulte Testimony.

55. Best Taxi scored the highest in project understanding. Boschulte Testimony.

56. Overall, Best Taxi made a better presentation and addressed WICO's concerns about keeping up with the market, tracking customer satisfaction, accepting credit cards, following rules and regulations, maintenance of the vehicles, and willingness to pay the $60,000.00 concession fee. Id.

## DISCUSSION

### A. Preliminary Injunction

It appears that the gravamen of VITA's lawsuit and motion for injunctive relief is that WICO improperly awarded the concession agreement to Best Taxi. VITA never alleged that WICO's actions constituted any sort of statutory violation or common law violation. On the first day of the preliminary injunction, the Court asked VITA to clarify what claim VITA is proceeding against WICO. VITA seemed unsure, then suggested a breach of contract claim.[12] VITA later advised the Court that it is asking the Court to review WICO's procurement determination, similar to the Court in *Tip Top Construction Corporation v. Government of the Virgin Islands*, 60 V.I. 724 (V.I. 2014).[13] In essence, VITA argued that WICO's procurement decision to award the concession agreement to Best Taxi was arbitrary and irrational and thus, failed to meet the arbitrary or irrational standard articulated in *Tip Top Constr. Corp.* VITA, as the moving party, has the burden of making some showing on all four factors. *3RC & Co.*, 63 V.I. at 557.

---

[12] The Court notes that VITA has no contract with WICO. As mentioned previously, VITA was operating on a month-to-month basis.

[13] VITA, like the plaintiff in *Tip Top Constr. Corp.*, claimed that the government agency improperly rejected its bid and awarded to another party — namely, VITA claimed that WICO improperly awarded the bid to Best Taxi and the bid should have been awarded to VITA. However, unlike the plaintiff in *Tip Top Constr. Corp.*, VITA never claimed that WICO's rejection of VITA's bid violated any Virgin Islands statutes or regulations. *See Tip Top Constr. Corp.*, 60 V.I. at 732-33 (the plaintiff requested the Superior Court to issue a declaratory judgment stating "that [the Government]'s rejection of its bid was improper and in violation of Virgin Islands statutes and regulations").

### 1. Plaintiff VITA's Reasonable Probability of Success on the Merits

■ When reviewing the factual basis for WICO's decision to award the concession agreement to Best Taxi, the Court will not disturb the procuring agency's decision unless it finds that WICO's factual determinations were arbitrary or irrational.[14] However, in the matter *sub judice*, this is of no consequence because VITA failed to meet the standard. The Supreme Court acknowledged that "[the moving party] must meet a very high burden to attain the extreme remedy of a judicial declaration that it *must* be awarded the contract, in that it would have to prove that [the selected bidder's] bid was so deficient, or [the moving party's] bid so compelling, that the [procuring agency] could not rationally award the contract to [the selected bidder] over the [moving party]." However, the Supreme Court cautioned that "the arbitrary or irrational standard only applies to justifications provided when the decision was initially made, and that extrinsic evidence — such as *post hoc* testimony provided by agency representatives for the first time at an injunction hearing — was not entitled to such deference." *Marco St. Croix, Inc. v. V.I. Hous. Auth.*, 62 V.I. 586, 592 (V.I. 2015). Therefore, the Court will not apply the arbitrary or irrational standard to the extrinsic evidence provided.

VITA argues that Best Taxi does not have the required number of drivers to meet the requirements for bid acceptance, has never operated a taxi concession, lacks the required insurance, does not have vehicles to accommodate disabled passengers, and fails to meet other requirements for its bid to be accepted. Upon review of the record, VITA never argued that WICO rejected its bid in violation of any statutes and regulations.[15] There is no provision mandating WICO to follow a specific procurement process. Thus, the central issue in this case is factual.

---

[14] VITA argued that the Court should not follow the Supreme Court's ruling in *Tip Top Constr. Corp.*, and instead, the Court should adopt a plenary standard of review when reviewing WICO's procurement decision. The Court sees no reason to not follow the Supreme Court's precedents; and thus, the Court will use the standard of review set forth in *Tip Top Constr. Corp.* and *Marco St. Croix, Inc.* It must be noted that the Supreme Court in *Tip Top Constr. Corp.* used "arbitrary and irrational" and "arbitrary or irrational" interchangeably.

[15] In light of *Tip Top Constr. Corp.*, when determining the applicable legal standard, this Court reviewed each argument that VITA made against WICO's procurement decision to determine if there were any questions of law that must be addressed.

The Court must determine whether based on the facts, whether WICO's decision to select Best Taxi was arbitrary or irrational. The Supreme Court in *Tip Top Constr. Corp.* used "arbitrary and irrational" and "arbitrary or irrational" interchangeably. However, this is not an issue before this Court; because the Court finds that WICO's decision was neither arbitrary nor irrational.

Although there is no requirement for WICO to follow a formal procurement process, WICO drafted an RFQ. The RFQ required applicants to meet certain criteria. However, WICO retained the right to waive formalities or technicalities and to make decisions based on its own business judgment. Applicants that made it to the final stage were given the opportunity to support its bid submission by presenting to the Board. The Board's final decision was not arbitrary because the final presentations were scored according to a point system; and the applicant was chosen after a majority vote by the Board.

WICO used the information from the presentations, RFQ submissions, along with supporting documents in order to select Best Taxi. Based on WICO's business judgment, Best Taxi satisfied the requirements under the bid. WICO took Best Taxi at its word and was confident that Best Taxi would be able to obtain 300 drivers and $2,000,000.00 insurance before executing the agreement and could get more drivers, if needed. Best Taxi has vehicles to accommodate disabled and special-needs passengers. WICO never gave Best Taxi a deadline to prove how many taxis they had. Contrary to VITA's assertions, the driver and insurance requirements were not necessary upon submission of the bid. Best Taxi could satisfy all requirements before the concession agreement is executed. Also, Best Taxi has some experience because it operated the Coki Point Beach and Coral World taxi concession. Based on these facts, the Court finds that WICO's determination that Best Taxi satisfied the RFQ criteria was neither arbitrary nor irrational.

■ WICO's decision to select Best Taxi was not irrational. WICO based its decision to select Best Taxi on its business judgment as a tourism industry leader. WICO determined that the best provider would have to be immediately prepared to meet the increasing competitive demands of the taxicab industry. WICO determined that Best Taxi was best prepared to meet its future business needs to service the cruise ship passengers, including millennials; because all of Best Taxi's drivers would be prepared to accept credit cards. WICO indicated that VITA may not be as

175

prepared for the technological changes because Parker stated that some of the older drivers would have issues with the machines. Def. Ex. 4A, 35: 17-20. One major deciding factor, which was a requirement under the concession agreement itself, was the provider's ability to pay the $60,000.00 per year concession fee. VITA indicated that it would be willing to pay $35,000.00 and would go up to $40,000.00 in concession fees. Best Taxi was willing to pay the entire $60,000.00 per year required concession fee. Furthermore, Best Taxi indicated that it would take steps to improve the passenger experience by requiring drivers to take a training course, track customer satisfaction by giving surveys to the tourists, and have mechanics inspect the vehicles semi-annually. Ultimately, the Board voted in favor of Best Taxi because Best Taxi could quickly adapt to WICO's needs — most importantly, implementing credit card machines in all vehicles and paying the $60,000.00 per year concession fee. Based on the testimony of Boschulte and Knight, VITA did not appear to be best suited to be able to keep up with the competitive market, accept credit cards, follow rules and regulations, and most critically, pay the $60,000.00 per year concession fee. Ergo, WICO's decision to award the bid to Best Taxi was neither arbitrary nor irrational.

VITA failed to meet the high burden of proving that Best Taxi's bid was so deficient, or VITA's bid was so compelling, that WICO could not rationally award the contract to Best Taxi over VITA. WICO's decision to award the bid to Best Taxi was neither arbitrary nor irrational. Thus, the Court finds that this factor strongly weighs against the issuance of a preliminary injunction.

### 2. Likelihood of Irreparable Harm to Plaintiff VITA

■ Irreparable harm is "certain and imminent harm for which a monetary award does not adequately compensate." *Yusuf v. Named*, 59 V.I. 841, 854 (V.I. 2013) (citations omitted). "When the moving party's 'loss is a matter of simple mathematic calculation, [it] fails to establish irreparable injury for preliminary injunction purposes.' " *See 3RC & Co.*, 63 V.I. at 559.

Upon careful review of the record, it appears that the heart of VITA's assertion that it will suffer irreparable harm if the preliminary injunction is not granted is money damages. At the September 8, 2016 Board meeting, Parker stated that if VITA lost WICO, then VITA would be lost. VITA has over 600 dues-paying members who pay up to $60.00 per

month in dues. Plaintiff VITA is the main source of income for hundreds of its drivers. VITA would suffer money damages if it did not get the taxi concession.

■ The money damages that VITA would suffer if it lost the taxi concession at the WICO dock are quantifiable. Money damages is an insufficient basis to grant a preliminary injunction. *See 3RC & Co., supra.* Therefore, Plaintiff VITA has failed to show that it will suffer irreparable harm. Thus, the Court finds that this factor strongly weighs against the issuance of a preliminary injunction.

### 3. Likelihood of Irreparable Harm to Defendant WICO

VITA argued that the Defendants will not suffer any harm if the injunction is issued, as an injunction will only maintain the status quo with VITA continuing to provide the necessary services. Currently, VITA does not have an existing contract with Defendant WICO. VITA's services are provided on a month-to-month basis. VITA pays $18,500.00 per year in concession fees. WICO would experience some harm from not having a concessionaire who is willing to pay $60,000.00 in concession fees. However, even though it would be a lesser amount, WICO would not suffer irreparable harm because WICO would still collect revenues from VITA if the preliminary injunction were granted. Thus, the Court finds that this factor weighs slightly in favor of the issuance of a preliminary injunction.

### 4. Public Interest

■ Finally, the Court must consider whether the public interest favors issuing an injunction. In exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction.

In the Virgin Islands, the economy relies heavily on tourism. The public has a great interest in ensuring that cruise ship passengers continue to have a great experience upon disembarking. Part of the tourist experience is adequate taxi service for all passengers. WICO is a government owned public entity that generates revenue for the Virgin Islands government. Eighty-six percent of WICO's business relates to the cruise ship industry. WICO, as a leader in the tourism industry, determined that, Best Taxi is best suited to meet the growing and

competitive needs of the industry and adapt to the future needs of the tourism industry which is of great benefit to the Virgin Islands economy.

Accordingly, the public interest will be best served by allowing WICO to exercise its business judgment and award Best Taxi the bid. Thus, the Court finds that this factor weighs strongly against the issuance of a preliminary injunction.

## CONCLUSION

The Court, after reviewing the case *ab ovo usque ad mala*, and based on the foregoing analysis, three factors weighed against the issuance of a preliminary injunction — with three factors weighed strongly against, and one factor weighed only slight in favor of the issuance of a preliminary injunction. When the factors are considered together and weighed against one another, the Court finds that VITA, the moving party, failed to make a clear showing that it is entitled to the extraordinary remedy of a preliminary injunction.

Accordingly, on October 26, 2016, the Court entered an order denying VITA's request for a preliminary injunction against WICO pursuant to its previous emergency Motion for Temporary Restraining Order and Preliminary Injunction against WICO.